Mr. Brueggemann, you may proceed. Thank you, Your Honor. May it please the Court, my name is Michael Brueggemann, I'm an attorney for Chief Zabarsky, LLC. I represent a patent this morning. We have three minutes to rebuttal. We are asking the Court to reverse the non-dischargeability judgment entered by the Bankruptcy Court. To start here, I'd like to distill the case into one simple rhetorical point. How can a creditor, who in this case is a landlord, who has been paid everything legally required regarding his underlying debt claim on his lease, claim it is a victim of actual fraud under Section 523? No formulation under 523 has ever recognized the results along these lines. Husky International does not mandate otherwise. The Bankruptcy Court in this case produced a very long recitation of facts and legal authority, but never really addresses this dead-on point, which again is entirely fatal to the appellee's claim for release under Section 523A2A. If I could further highlight the Bankruptcy Court's overarching error, it would be this. The Bankruptcy Court in this matter lost focus that Section 523 claims are strictly construed against the creditor. Discharge is one of the cornerstone rights afforded a citizen, and thus exceptions from discharge are to be strictly construed so as to give maximum effect to the policy of the Bankruptcy Code to provide debtors with a fresh start. On this record, when Michael Wigley, a transferor, paid his creditors, completed Chapter 11, and received a discharge, the Bankruptcy Court did not report an ounce of grace towards the appellant, even though her involvement in Michael Wigley's financial disputes was paper-thin. In fact, she restored nearly all of the transfer's property to his creditors. It is impossible to conceive that the Supreme Court would have condemned the appellant on a strict construction standard on the fact of this case. The Bankruptcy Court's decision is irreconcilable with all prior jurisprudence regarding Section 523, and requires reversal under any possible standard of review. I stand by the entire... Mr. Brogan, this is Judge Nell. Let me interrupt you. You made an interesting statement. You indicated that the letter had been paid all it was owed. There's a State Court Fraudulent Conveyance Judgment, and I apologize, I don't have the exact figure, but it's somewhere north of $700,000 plus interest, I'm assuming. Lariat received $300,000-ish in Wigley's case, and received another like sum in Ms. Wigley's case. Has the entire amount of the Fraudulent Conveyance Judgment been satisfied? To clarify one point, Mr. Wigley paid $650,000 approximately, and Ms. Wigley paid $360,000. So, in combination, they're just south of a million dollars, I think, in total payments to Lariat. Lariat's tax claim as a landlord was paid prior to Ms. Wigley's bankruptcy filing. I believe they, in combination, have paid more than the Fraudulent Conveyance Judgment that was entered. There is some dispute still about application of those payments on the merits, whether they should apply to the judgment as a whole that was raised before the bankruptcy court in the prior claims dispute that came before this court, and those issues are still out there. They were moved along. Mr. Brigham, this is Judge Dowd, but didn't the trial court address that issue? He was aware of that, and he said if it gets ruled one way, then there's still $600,000-some-thousand due. If it gets ruled another way, there's still approximately $49,000 due. But either way, there's some damage, and isn't that all that's necessary? Because we're not talking about liquidating the claim here. We're only talking about whether or not whatever claim may remain is non-dischargeable. Yes, but my point is, John, is that fraudulent transfers claims are collection remedies, and in this case, Lariat as a landlord had an underlying debt claim. Mr. Wigley paid that underlying debt claim in full prior to Mr. Wigley filing bankruptcy in this case, and so my point is, has there ever been a case where somebody in Lariat's position can say they're a victim of actual fraud, where they've recovered everything they should have recovered in the first place as a creditor? Well, that gets us back to the question that Judge Neal asked to begin with. There is a monetary judgment, a final judgment against your client, and you're saying that the record shows that every dollar of that judgment has been paid? No, your honor, I'm not saying the judgment has been satisfied, although I don't want to wage arguments that are pending in other arenas, but my point is, we're trying to define actual fraud in a case which is under strict construction, and we have a creditor, almost every case I've ever seen, I can't think of a case in the country, we have a creditor that comes to the court with their pocket bank on a 523 claim. This case is very unique and different in that this creditor has actually been paid its underlying lease claim that was capped in Mr. Wigley's case. Mr. Wigley owed no further amount on that claim. They were paid the allowed amount of the claim in her case, correct? Correct. And that's because it was capped, but some amount still remained unpaid. That's the disallowed portion. Yes, and did not the trial court address this issue specifically when he noted that in this context that the claim is disallowed in whole or in part based on bankruptcy principles. For example, because of a statutory cap, the debtor's indebtedness to the creditor is not discharged and the creditor is not barred from collecting the disallowed claim outside of bankruptcy inside of the McAlpin case from 2000. Your Honor, McAlpin involved interest and penalties on a tax debt, which I believe under the code there is a provision where there could be a disallowance, but it can also remain non-dischargeable. If the disallowance is based on substance of the claim, which we'd argue here is based on the nature of the landlord, it is not clear that you can use a non-dischargeable provision like 523A2A to resurrect this law claim. And as a reminder too, this claim... But Mr. Brueggemann, this is Judge Neal. You didn't raise that argument in your opening brief. You didn't claim that the bankruptcy court erred as a matter of law in relying on McAlpin for the proposition Judge Dow just stated. Haven't you raised your argument regarding that? No, Your Honor. I believe we cited McAlpin and stated that the bankruptcy court's reliance on McAlpin property was within the context of our argument that the bankruptcy court has failed to recognize the claim that's lost and the consequences of that. It's a very unique circumstance. Certainly not a circumstance that would be considered a custom, which was an entirely different case than what occurred here. The bankruptcy court's decision as custom has substantially similar facts. It's simply not sustained under any standard of rule. Mr. Brueggemann did not file Chapter 7 to attempt to leave his creditors completely unpaid. In fact, he completed a full payment chapter with his client. Prior to his filing date, he paid preceding each paid creditor settlement to other creditors. He used the transferred assets to pay creditors. It was not a transfer of all assets, unlike the custom, which involved a complete draining of assets. The transferred assets weren't liquid. There was a partnership interest that had restrictions on what they could be paid to creditors. Husky involved cash transfers. Husky involved 176 cash transfers to eight different ends, resulting in an equal amount of barrier for any creditor to rationally reasonably recover those. In this case, the transfers involved three transfers to one person for all the flows. You may recall, Your Honor, that the county made an effort to dismiss Michael Wigley's bankruptcy case and fail. The bankruptcy court found the elaboration to be fake and allowed him to proceed. Mr. Brueggemann, excuse me. I don't know whether others are having this difficulty, but you're really breaking up. The connection is bad. I don't know if the other judges are having this similar problem. I don't know whether you're on a cell phone or what it is, but if there's something you can do to improve the clarity, I would really appreciate it. Is this better? It is, as a matter of fact. Okay. I apologize. My office has had some issues. Just tell me, and we'll try this. The point, the bankruptcy court found, in his case, he was operating the case, and I can say that Michael Wigley was actually operating a fraudulent scheme. In addition to not operating a fraudulent scheme, there wasn't any fraudulent acts, such as absconding, false testimony, concealment of the transfers, or transfer of substantially all assets, as stipulated. Mr. Brueggemann, this is Judge Shogine. Didn't the state court judgment find, you know, based upon that fraudulent transfer, I mean, do we re-litigate all of that now? I mean, it seems that Lariat has already proven that a fraudulent transfer occurred, and so if that's the case, do all of the badges of fraud need to be reviewed again, or is just the act of receiving the funds and dispersing them, as outlined by Judge Fisher, enough? Your Honor, we would contend that Husky does not establish that a fraudulent transfer finding, in and of itself, is sufficient to establish actual fraud under Section 523. As we just noted, there are substantial differences in the types of conduct between the debtor and Husky, and between the transferor, Michael Wigley, and his spouse in this case. But in Husky, was there a state court fraudulent transfer judgment made against Ricks? There was not. There was a pending case. But Judge Fisher did not apply collateral estoppel, nor would it have been appropriate, because Husky and the Eighth Circuit have stated that actual fraud is not something applied in fact, implied by circumstances. It still requires actual conduct that arises to deceive, artifice, trick, or design. Conduct intentionally designed to mislead or deceive creditors. In this case, there wasn't a conduct that there was transfers, but they were all disclosed. There was no hindrance towards disclosing the transfers, or allowing the creditors to pursue such. So what facts did Judge Fisher, which facts do you allege are clearly erroneous then in the determination he made in concluding that actual fraud existed? Well, it's the facts he relied on over other facts that he ignored. The truth being that Appellant did not retain these transfers. Appellant paid these transfers over to other co-plaintiffs of Lariat, who were Bremer Bank and Home Federal Savings Bank. Those settlements reached in 2012, and Appellant eventually paid over $600,000 at that time to those two creditors, retaining the remaining funds that were eventually used in her Chapter 11 case. And so we think that fact is chief among all the facts here. That singular piece of rehabilitative conduct by Appellant outweighs any other inference of fraud that the bankruptcy court drew from the circumstances. Mr. Bergen, this is Judge Falgan. Isn't that inconsistent with the law that says that no one of the badges of fraud is determinative? The court can look at a variety of things, and the court can look at any circumstance in determining fraud. I don't know that you've cited any law that says that that one factor, the fact that the funds were used to pay some creditors, over-trumps everything else. That's not the only badge of fraud absent, though, in the case, Your Honor. The other wasn't a transfer of substantially all of Mr. Wiggler's assets. He used other assets to eventually pay Appellant in this case. There was no direct conduct of absconding, and the bankruptcy court's finding and Mr. Bergen, this is Judge Chaudine again. We're not evaluating Mr. Wiggly's conduct in this case, are we? It goes to the transfers received and Mrs. Wiggly's involvement in those transfers. So whether or not Mr. Wiggly did something in his bankruptcy case, how does that get applied here? I guess I'm not tracking that argument. And that's our point, Your Honor, is that most of the opinion that the bankruptcy court authored focused on Mr. Wiggly's acts. Appellant's acts were fairly general and passive as to what Mr. Wiggly did in this case. There's no record of her at all taking any action to conceal transfers, hide property, abscond, or give any false testimony. And as we noted, she in fact retained the property and paid them over to other antecedent creditors on par with Lariat at the time. And that conduct, that rehabilitative conduct is very unique to this case. And there are cases that we cite in our brief where courts have factored that in granting relief to debtors under 523 claims. In fact, the Husky remand before the Southern District of Texas considered that conduct. But in that case, found that the debtor had not made other transfers to replenish other assets or made efforts to repay his debts. Appellant here did the opposite. The case cited Inres Scarpella, which was a bankruptcy case in North Dakota, which involved a debtor facing a 523 claim for embezzlement. The court granted relief for the debtor and denied such claims based on some of her conduct in pledging Homestead and other assets towards repaying that debt after the alleged embezzlement had occurred. And that's what Mrs. Wigley did here. She repaid. She allowed these transfers to be repaid to other creditors of Mr. Wigley, thereby, of course, settling and reducing his debts prior to his Chapter 11 filing. In discarding and ignoring appellant's rehabilitative conduct, the bankruptcy court appears to stand alone in that position. And it's a basis for its judgment to be reversed. Mr. Bruggeman, this is Judge Nail. You keep saying ignoring. Isn't it more accurate and perhaps fairer to say that the bankruptcy court weighed the factors differently than you would have preferred? I'm not aware of anything in his ruling that would suggest that he ignored any of the factors. It's a difference of wording, Your Honor. He, the bankruptcy judge, can be reversed by unreasonably weighing all the facts and circumstances of the case. And that's ultimately what our position is here. I understand that. But you keep saying ignoring. It seems to me that suggests that he looked at the factors and said, I'm not going to give that. I'm not going to even consider that. I'm not going to look at that. I'm not going to take it into account. And I'm not aware that that's how his ruling reads. My perception of it is that he ignored it. He didn't find it worth considering. He said his point of view was, well, Mr. and Mrs. Wigley said they were making these transactions for estate planning. And then when Mrs. Wigley repaid them, that obviously it wasn't for estate planning. So I'm just not going to factor that evidence. And our position is you can't ignore it. You can't not factor it entirely. It is a narrow construction standard in favor of the debtor. The debtor under bankruptcy should be able to rehabilitate mistakes or negative conduct. That is a core of getting a fresh start. You have a case here where Lariat, the record affirmatively shows that regardless of the fraudulent transfer judgment, which is really a different inquiry altogether than an actual fraud, even though there's definitely overlap between the types of conduct. The record affirmatively shows here that Lariat would have never collected these assets, even if they weren't transferred. There's a total lack of proximate cause. Excuse me, Mr. Brueggemann, Mr. Brueggemann, you've got your three minute warning. I will preserve that three minutes. Thank you. Thank you. Mr. Warner. Thank you, Your Honor. May it please the court, opposing counsel. I represent the appellee Lariat Companies, Inc. this morning, and we would respectfully request that Judge Fisher's decision be affirmed in all respects. And I think I'll start by proceeding directly to the end. Judge Fisher, following a two-day trial, issued 19 pages of findings of fact, including 74 separate paragraphs with 156 references to the exhibits and evidence, 23 references to the Wigley's testimony, and followed that with what was, when transcribed, 137 pages of conclusions of law. And on pages 68 and 69 of the conclusions, ECF 75, Judge Fisher stated, and I'll quote, quote, the court is convinced that Barbara Wigley knew the transfers from Michael Wigley were done with fraudulent transfer and that she was a willing participant in the scheme. That's on page 69. And that's what's being appealed today. The standard is clearly erroneous, and Barbara Wigley seeks to overturn Judge Fisher's ironclad decision, finding that Barbara Wigley, under the Husky decision, was a willing participant in the fraudulent transfer scheme. And that because of that, Lariat's state court fraudulent transfer judgment, or more specifically the unpaid remaining portion of that judgment, is non-dischargeable. Judge Fisher held it was non-dischargeable, and that ruling should be affirmed in all respects. Judge Fisher correctly applied the three-element test sent out in the Husky decision to determine whether that state court judgment was going to be non-dischargeable. And those three elements, which are described at pages 19 and 28 of the transcript, are that first, Michael Wigley transferred his assets with the actual intent to hinder, delay, or defraud his creditors. Second, that Barbara Wigley possessed actual fraudulent intent, and that is she acted as an accomplice or colluded with Michael Wigley in receiving the transfers. And then third and finally, that these actions resulted in impairment or injury to Lariat. And Judge Fisher analyzed all three elements and made extraordinarily detailed findings as to each of the three elements, and that is the issue presently on appeal. As to the first element, Michael Wigley transferred his assets with the actual intent to hinder, delay, or defraud his creditors, Lariat successfully proved the existence of a fraudulent transfer scheme. And in fact, Lariat's proved it three times, first in the state court before Judge Rosenbaum, later in the state court before Judge McGill, and a third and final time in the bankruptcy court before Judge Fisher. Judge Fisher found in analyzing the enumerated and other badges of fraud that Lariat had successfully shown the existence of a fraudulent transfer scheme, and he went element by element through all of the facts in the record and concluded that that fraudulent transfer scheme had been successfully established. The first element was the transfer for the benefit of an insider, and that's easily established here, Barbara Wigley was his spouse. The second element was the presence of the lawsuit that's described at page 36 of the transcript, and the evidence was that Barbara Wigley and Michael Wigley both knew that they were under the threat of litigation at the time that the transfer, or transfers, plural, were made. The third element was the lack of reasonably equivalent value, that is, nothing was received in exchange for the transfers. Judge Fisher, in fact, found that collateral estoppel applied on that equivalent value finding from the state court proceedings, and he didn't rely on the state court proceedings as to all of the badges of fraud, but he did find that some of them would apply in the bankruptcy context. The fourth element was retention of possession and control of the property, and the court made some very specific findings with regards to the bank account that haven't yet been addressed today, and in addition to the transfers of the Spell funds, there is testimony both from Barbara Wigley and Michael Wigley at trial that proved telling, and specifically that testimony was how Michael Wigley removed his name from the only bank account he had And I think the court may well have chosen to focus on that factor and that behavior rather than other factors in determining the intent of the parties, and that's because that conduct is simply so dramatic it's hard to explain away. The next element would have been the length of time between the transfers and the occurrence of substantial debt, and Judge Fisher focused on how these transfers occurred on the eve of a summary judgment motion when both Michael and Barbara Wigley knew that their assets were at substantial risk. The next element is the concealment element, and here the court in paragraph 29 makes a very specific finding when it says, and I'll quote, this testimony regarding the motivation behind the transfer of the U.S. bank checking account is not credible given Michael Wigley's continued use of the account, close quote. And again, this is the trial court making specific findings of fact after hearing the evidence, hearing the testimony of the witnesses, observing their demeanor, and weighing everything in its totality. The next element is Michael Wigley's insolvency, much to do has been made about the insolvency element, but as the court holds, it is not dispositive or determinative. That is, it's in essence a red herring. It's just one of the many badges of fraud, and it doesn't control the analysis. And then the court goes on to consider other factors, and again, this is perhaps one of the most significant points, but it's overlooked. Using the analysis from Ritchie Capital, Judge Fisher correctly notes that he can consider any other relevant factors in making his factual determination whether there was fraud here or not. And he weighs very heavily Michael Wigley's own testimony at trial. In fact, the court says, and I'll quote, and this is from page 57 of the conclusion of law, it is as close to a direct admission as one gets in a fraudulent transfer case, comma, as the statement demonstrates Michael Wigley's true intent that he made the transfers as a protected measure in hoping to make it harder, comma, or even impossible, comma, for his creditors to collect from him, close quote. And again, that is a direct finding of fact. The court, having heard the testimony of the witnesses, having seen all the facts of this case, concludes, and it's virtually an unassailable conclusion, that Barbara and Michael both had actual fraudulent intent when they engaged in these transactions. And given the facts at issue, it is no surprise. Mr. Warner, this is Judge Dowd. I understand what the rulings were on those various other badges for fraud, and about some of them there's really not much question, but I think before your time runs out, we need to get to the ones that if someone's really complaining about, and the paramount one in their own words, and which they think should be paramount and which they claim that the trial court ignored or at least failed to give proper weight to, is the fact that the money that was received essentially got funneled back to pay creditors. And isn't it somewhat anomalous to hold that it's a fraudulent transfer under those circumstances? No, Your Honor. In fact, I think I would argue the exact opposite. That is one perspective that can be taken when looking at this, but I think it's important to look at it from a different perspective. Namely, what Michael Wigley did was very successfully to park or hide roughly $800,000 worth of his assets in Barbara Wigley's name for a short period of time. I believe it was approximately... Mr. Bergerman, this is Judge Chaudine, and I guess I want to make certain I'm understanding your argument. You keep talking about Mr. Wigley's behavior. Aren't we evaluating Mrs. Wigley's behavior under this dischargeability action? And that kind of goes to some of the questions that Judge Dowd just asked about, you know, when she received the funds, she paid it to creditors. And I guess I'm not understanding exactly what Mrs. Wigley's role in all of the transfer issues were. We keep referring to Mr. Wigley, but that's a separate question, isn't it? It is, Your Honor, but the two are tied together. Once Mr. Wigley's fraud is established, and I will assume we're moving on to Barbara now, then the second element, and Judge Fischer addressed this, the second element is Barbara Wigley's fraud. And her fraud is that active participation, that collusion in evading Mr. Wigley's creditors. And this goes directly back... But didn't she use the transferred funds to pay Mr. Wigley's creditors? I think that's what Judge Dowd was asking. Maybe I misunderstood and he can correct me. No, that's right. Ultimately, Ms. Wigley did, in fact, pay selected creditors of Mr. Wigley. Only those creditors that she was instructed to pay by Mr. Wigley, only those amounts she was instructed to pay by Mr. Wigley, and exactly by which means, such as wire transfer that Mr. Wigley instructed her to. So, again, her participation is in holding the money safe from the claims of all creditors, and then deliberately and intentionally participating and paying later selected creditors that Michael Wigley wishes to pay. And this is a fundamental point, I believe, because it's directly in opposite to the bankruptcy code, which is that equal creditors should be treated equally and fairly. What Michael Wigley... But did you prove, Mr. Bergman, I guess I'm not understanding why Lariat should be paid ahead of other creditors. I guess I'm not tracking with that. Just because they chose to pay some other creditor, why did that put your client in the position of demanding that they should have been paid instead of someone else? And let me just jump in quickly. I just want the record to be clear. This is Mr. Warner that is arguing now. Thank you, Your Honor. I'm sorry about that. I don't have the notes right in front of me. Apologies. No apologies needed. Lariat does not contend it should have been paid prior to any other creditor. Lariat complains that its collection efforts were thwarted by the deliberate and intentional acts of Michael and Barbara Wigley to take certain assets we might have had an opportunity to collect in the state court proceedings and couldn't because they were hidden in Barbara's name with Michael retaining possession, control, dominion over those assets. And then later, when the risk was gone that Lariat would sweep those assets or collect them in the state court judgment action, Michael goes back and tells Barbara which of his creditors he'd like to prefer and who he'd like to pay with those funds. And that is the fraud here. The hindrance, the delay, the impairment to Lariat is those assets are fraudulently transferred to Barbara, hidden and secreted. We cannot get control of them. We cannot apply them to the judgment. And then only later, when Michael decides he wishes to selectively prefer and pay certain creditors but not Lariat, does he then exercise the control he's retained over those assets and he instructs his wife whom to pay, how much to pay, and how to pay. And Judge Fischer correctly found that that was Barbara's intentional decision to participate in the fraud. One, by holding the assets, and then two, by following the bidding of Mr. Wigley when he later tells her what to do with those assets. And it goes directly as well to the only proffered explanation, the only legitimate basis that the Wigleys try to advance the trial for why the transfers were made. And that is, they argue, this isn't fraud at all. We were attempting to shore up Barbara Wigley's estate. These transfers were made for estate planning purposes. Well, Judge Fischer hears that and says, that doesn't hold water. If the entire purpose of the transaction is to bolster Barbara's estate, it's completely undone when Michael later tells Barbara who to pay and drains the money out of her estate. And her estate's never bolstered further. So it shows, again, that they're both actively participating in this fraudulent transfer scheme and that the only explanation, the only basis that they offer at trial explaining this conduct simply is nonsensical. Given their later conduct, it just doesn't hold water. Mr. Warren, I'd like to move to another point and give you a chance to address it before you run out of time, and that is, because these are the first words out of Mr. Brigham's mouth, he's basically saying that you guys have already paid everything you're entitled to, and that this transfer did not approximately result in any damage to you, and for example, that you have to prove that you would have gotten or been able to collect on the assets that were transferred to her and you hadn't done that. So what are your responses to those contentions? Excuse me if I can interrupt. You do have five minutes left, counsel. Thank you. Well, under Husky, let me step back. The present appeal is from the trial before Judge Fisher on the issue of non-dischargeability. So although my colleague made significant argument regarding the claim amount or the specific figures of the outstanding judgments and all the rest, that's not properly before the court today. What is before the court is simply the trial court's ruling as to the non-dischargeability character of the state court unpaid portion of the state court fraudulent transfer judgment entered against Barbara Wigley. Now, the exact amount of that judgment is certainly in dispute and will be, I'm sure, bitterly litigated in the state court proceedings and perhaps in other appellate proceedings, but it's not properly before the court today. Judge Fisher found, and in his order, I believe, addressed the fact that this is not a claims proceeding, that the amount of the claim Lariat may continue to possess against Barbara Wigley is not an issue. It's just rather the character of the claim. Is it dischargeable or non-dischargeable? And Judge Fisher properly found it was non-dischargeable. Now, as to the amount of the claim, I'd like to make two points. First, but for Barbara and Michael Wigley's fraudulent conduct, this judgment wouldn't exist to begin with. That is, this could have all ended long ago with Michael Wigley's payment of his 502b6 capped amount in his bankruptcy, but for his decision and his wife's decision to engage in this fraudulent transfer, his liability would have ended with the consummation of his Chapter 11 plan. So they, in fact, brought this on themselves. And then secondly, as to the amount of the state court fraudulent transfer judgment, well, that was determined in the state court proceedings. A portion of it was paid through Barbara's plan with the allowed claim in her plan, and after application of that payment, there remains an outstanding balance under the state court judgment, which, again, Judge Fisher held to be non-dischargeable, and Lariat will now proceed to attempt to collect through the state court enforcement measures. So I believe that addresses the court's question, but if I've missed it, I'd like to know and make sure I provide more information. No, thank you. That's fine. And with that, Your Honors, I really have little to add today. I would simply conclude by saying that Judge Fisher's September 19, 2018 decision is extraordinarily detailed and well-written. It is fully supported by all the evidence. It should be affirmed in all respects. Thank you. Thank you, Mr. Warner. Ms. Harrison, how much time does Mr. Brogan have left? He has two and a half minutes. Okay. Thank you. Mr. Brogaman? I'm sorry, Your Honor. It's three minutes, not two and a half. Okay. Hi, Paul. Your Honor, I just made the same mistake as other counsel on the rebuttal there. You're in good company. Just a quick housekeeping. Our reference to McAlpine in the brief was page 23, and our footnote 5 in our position on that is McAlpine just doesn't get the bankruptcy judge to where he wants to go. There really isn't any case law authority standing for the proposition that just because a disallowed claim can be resurrected and practiced through a 523A2A claim. I'm turning towards just a few points on rebuttal here. Selected creditors paid here were co-plaintiffs of Lariat. They were antecedent creditors on the same business debts essentially Lariat had. We haven't been arguing about amount of claims in this case, and we think it's unfair for the What our point has always been is Mr. Wigley had a lease liability. He paid it through his bankruptcy. How can anything beyond that be considered actual fraud under those circumstances? Ironically, and Mr. Warner acknowledges this, had these transfers not occurred, Lariat would have only received approximately $640,000, $50,000 in this case. Excuse me, Mr. Bruggeman, this is Joe Dowd. Again, doesn't the answer to your last question lie with the Supreme Court's opinion? It says in one place, Thus, anything that counts as fraud and is done with wrongful intent is actual fraud, and later says common law term actual fraud is broad enough to incorporate a fraudulent conveyance. Doesn't that answer your question? I agree with that, and my point to that is, Your Honor, it is not actual fraud in a fraudulent transfer scheme is not per se synonymous with just simply finding a fraudulent transfer, and can you find a case that says that all these creditors have been paid and the transferor has made good with all those creditors, and yet somehow actual fraud has occurred? To draw another distinction, particularly since we are focusing on appellant conduct here, even though most of the discussion has been on Michael Wigley, she retained these transfers. In one case I haven't cited today that is cited in that brief is the McClellan case, which makes it clear that a transferee can commit actual fraud if she takes those transfers and further obscures them or transfers them, again, sells the property, dissipates the proceeds. Mrs. Wigley here did the exact opposite of what was done in McClellan to establish actual fraud. Excuse me, counsel, your time is up. Okay, thank you. Your Honor, the result in this case cannot reconcile with the narrow construction requirement afforded debtors and must be reversed. Thank you, Mr. Brueggemann, and thank you, Mr. Warner. Ms. Harrison? Court will be in recess until further notice. Thank you.